IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-00991-PAB-KMT

CAROL M. GIANFRANCISCO,

      Plaintiff,

v.

EXCELSIOR YOUTH CENTERS, INC.,

      Defendant.
_____

**ORDER**
_____

      This matter is before the Court on the Motion for Summary Judgment [Docket No. 72] filed by defendant Excelsior Youth Centers, Inc. ("Excelsior").  The motion is fully briefed and ripe for disposition.

## I.  BACKGROUND[1]

      This case arises out of plaintiff Carol M. Gianfrancisco's employment with Excelsior – a residential treatment center for teenage girls with emotional and behavioral difficulties.  Gianfrancisco was employed by Excelsior for a period of 24 years, beginning on August 27, 1984 and ending with her resignation on September 3, 2008.  After her resignation, Gianfrancisco filed a charge of discrimination with the Colorado Civil Rights Division alleging that, during her employment with Excelsior between May 17, 2008 to September 3, 2008, she was subject to wage discrimination because of her gender, discrimination based on her Italian national origin, and

_____

[1]The following facts, unless otherwise indicated, are not in dispute.

retaliation for reporting discriminatory conduct.  Docket No. 72-22.  On December 23, 2008, the Equal Employment Opportunity Commission ("EEOC") issued Gianfrancisco a right-to-sue letter, Docket No. 72-23, and on March 18, 2009, Gianfrancisco filed this lawsuit alleging that Excelsior violated Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*[2]  Docket No. 1-2.

## A.   Wage Discrimination

Excelsior's treatment centers are divided into different campuses (cottages) where students take classes and participate in counselor-led therapy programs.  In 1984, Gianfrancisco began her employment with Excelsior as a Math Teacher and, over the course of her employment, worked as a Development Aide in 1985 and a Team Coordinator beginning on August 10, 1987.[3]  During this time period, Gianfrancisco secured a Master's Degree and became a Licensed Professional Counselor.

As a Team and Treatment Coordinator ("TTC"), Gianfrancisco was in charge of Excelsior's Renaissance cottage and her usual duties included supervising other counselors as well as providing clinical treatment for students.  Compared to other cottages, Renaissance was known for having difficult students and requiring greater oversight.

---

[2]In the complaint, plaintiff alleges violations of the Equal Pay Act, 29 U.S.C. § 206(a).  *See* Docket No. 1-2 at 23.  However, in the Final Pretrial Order [Docket No. 81] plaintiff mentions only Title VII of the 1964 Civil Rights Act.  Because the Final Pretrial Order is the operative pleading, *United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1235 (10th Cir. 2000), the Court will address plaintiff's Title VII claim only.

[3] In November 1995, Excelsior converted the Treatment Coordinator position into the "Team and Treatment Coordinator."

On July 29, 2004, plaintiff accepted a position as an After Care Coordinator ("ACC").  After changing positions from a TTC to an ACC, Gianfrancisco retained the same compensation.  Because her yearly salary remained the same, plaintiff claims that she believed that her position as an ACC was a lateral position change.  Excelsior, however, argues that a TTC usually has more responsibilities than an ACC and that the two positions are not comparable.  Heather Hurd, a Licensed Professional Counselor, also noted that one of the differences between an ACC and a TTC is that an ACC does not have to supervise a team of counselors.  Docket No. 77-8 at 3 (Hurd Dep. 25:1-8).

After Gianfrancisco accepted a position as an ACC, employee Martin Zaffaroni was asked to oversee the Renaissance cottage.  Zaffaroni was a TTC who began his employment with Excelsior on September 12, 1982 and became a Treatment Coordinator on July 1, 1988.  Zaffaroni was also Gianfrancisco's supervisor in the mid-1980s.  However, unlike Gianfrancisco, Zaffaroni is not a Licensed Professional Counselor.

According to Joan Gabrielson, Excelsior's Executive Director, Zaffaroni was chosen to oversee the Renaissance cottage after two traumatic incidents occurred there.  Gabrielson states that Zaffaroni was tasked with revamping the Renaissance cottage by implementing new programming for the students.  Zaffaroni had previously revamped programming at Excelsior's Larkspur cottage.  Docket No. 77-2 at 3 (Zaffaroni Dep. 29:24-25).

Gianfrancisco alleges that, when she changed position in 2004, she was unaware of the salaries of her fellow employees.  She claims that Excelsior admonished its employees not to discuss salaries and that no one at Excelsior

discussed compensation.  Gianfrancisco contends that it was only upon her departure

from Excelsior in September 2008 that Wendi Roth, a former Human Resources

employee at Excelsior, informed her that Zaffaroni earned more than she earned as the

TTC for the Renaissance cottage.  Gianfrancisco claims that, after speaking with Roth,

she began to research the salaries of employees at Excelsior and discovered that

Zaffaroni had earned a higher yearly salary since 2003.

Gianfrancisco claims that, as of January 1, 2004, she earned a yearly salary of

$54,018.00, which did not change when she switched positions from a TTC to an ACC.

Docket No. 72-1 at 3.  Zaffaroni, on the other hand, earned an annual salary of

$52,604.03 as of January 1, 2004, which increased to $55,602.30 on July 12, 2004

when he began to work at Renaissance cottage.[4]  *Id*. at 5.  Gianfrancisco claims that,

because she is a Licensed Professional Counselor and Zaffaroni does not hold such a

license, she should earn a higher yearly salary.  Based on this information, she asserts

that she was subject to wage discrimination because she earned a lower yearly salary

even though she had more credentials.

Excelsior, however, claims that employee compensation is based primarily on

seniority.  Excelsior also asserts that Gianfrancisco was aware that seniority was a

factor in salary decisions as evidenced by her 2004 email to Bill Gregory, Excelsior's

former Executive Director.  *See* Docket No. 85-3.  Moreover, Excelsior argues that

---

[4]Gianfrancisco's yearly earnings were as follows: $55,097.00 on September 1, 2004; $56,199.00 on July 19, 2005; $58,447.00 on December 1, 2005; $61,369.00 on September 1, 2006; $64,437.00 on September 1, 2007.  Docket No. 72-1 at 3-4. Zaffaroni's yearly earnings were as follows: $57,270.51 on July 19, 2005; $58,415.97 on December 1, 2005; $61,336.70 on September 1, 2006; $62.036.70 on April 2, 2007; $65,138.53 on September 1, 2007. *Id*. at 6.

Gianfrancisco's 2004 email proves that she was aware of her co-workers' salaries because the email complains that her 2% raise was lower than other employees' raises. *Id*.

## B.   Hostile Work Environment and Constructive Discharge

In addition to the gender discrimination claim, Gianfrancisco asserts that the events surrounding a school-sponsored play performed at Excelsior created a hostile work environment and led to her constructive discharge.

At the end of every semester, Excelsior students, teachers, and other staff members perform a play to celebrate the semester.  The plays are typically satires which focus on events that have occurred at Excelsior throughout the semester.  Darrell Brown, a teacher at Excelsior, has written all of the plays performed at Excelsior.  On May 15, 2008, Excelsior's staff performed a play authored by Brown entitled "Nightmare on Oxford Street, Part 41: Uniformity."  Docket No. 72-6.

Gianfrancisco did not see the play because of a prior engagement, but was able to read the script.  After reading the script, she thought that the play was offensive because it ridiculed group therapy programs and defamed Italian Americans.  Although the play parodied others at Excelsior, Gianfrancisco believed that one of the characters in the play, "Vito Tortellini," an Italian mobster, was a caricature of Italian Americans. According to Gianfrancisco, Vito Tortellini spoke with a strong Italian accent, used stereotypical mobster slang, and generally depicted Italians as unintelligent, violent criminals.[5]  Gianfrancisco also thought Vito Tortellini mocked her demeanor,

---

[5]Gianfrancisco was offended by the character's use of colloquialisms such as "youse" instead of "you," and references to making individuals "sleep with the fishes."

appearance, and made implications about her sexual orientation because he wore a

"granny wig" that matched her hair color and was in charge of two therapy programs

similar to ones she conducted for her students.  Docket No. 72-13 at 2; Docket No. 72-4

at 9 (Gianfrancisco Dep. 15:11-22); Docket No. 77-8 at 2 (Hurd Dep. 21:8-12).  Hurd

and Victoria Sicard, Excelsior's Recreational Coordinator, were also of the opinion that

Vito Tortellini was a thinly veiled parody of Gianfrancisco.

On May 19, 2008, Gianfrancisco wrote an email to her supervisor, Carol

Beauchamp-Hunter, and to Vivian Zlobec, Excelsior's Director of Human Resources, to

voice her complaints about the play.  *See* Docket No. 72-8.  In response to plaintiff's

email, Beauchamp-Hunter advised plaintiff that Gabrielson would conduct an

investigation.  On May 20, 2008, Gianfrancisco sent Zlobec an email describing

discrimination with respect to national origin, Docket No. 72-10, and another email on

June 2, 2008 advising Zlobec and Beauchamp-Hunter that she would not be satisfied

with a simple apology.  Docket No. 72-13.

To address plaintiff's concerns about the play, Zlobec held a meeting with

Gianfrancisco on June 5, 2008.  At the meeting, Zlobec gave plaintiff a copy of a letter

of apology written by Brown.  Docket No. 72-5 at 6 (Gianfrancisco Dep. 74:20-24).  In

the letter, Brown apologized for writing the play, insisted that the character of Vito

Tortellini was not a caricature of Italian Americans, stated that it was not his intent to

defame Italian Americans, and agreed to "accept sanctions without complaint."  Docket

No. 72-14.  Gianfrancisco rejected Brown's letter of apology and informed Zlobec that

---

*See generally* Docket No. 72-4 at 16-18.

she expected Brown to be formally reprimanded instead.[6]  On June 12, 2008, Zlobec

held a meeting with Brown and Gianfrancisco wherein Brown again apologized and said

that he would no longer write plays for Excelsior.  Docket No. 72-5 at 10-12

(Gianfrancisco Dep. 84:16-86:18).  Zlobec then held a third meeting with Gianfrancisco,

Jann Clevenger, a Supervisor at Excelsior, Beauchamp-Hunter, and Jim Uhernick.  In

this meeting, Gianfrancisco discussed her feelings about the play and received an

apology from Clevenger.  Docket No. 72-15.  Thereafter, plaintiff applied for and

accepted a position with Denver Public Schools at the Contemporary Learning

Academy ("CLA").  Docket No. 72-20 at 1.  Her last day of work at Excelsior was

September 3, 2008.  *Id.*

Gianfrancisco alleges that, because of Excelsior's refusal to publicly reprimand

Brown, she was forced to seek employment elsewhere.  Docket No. 72-5 at 32

(Gianfrancisco Dep. 149:6-11).  She claims that the play, her removal from the group

therapy sessions and the Canine Healers program made her feel "less trusted and less

credible."  *Id*.  She made the decision to resign from Excelsior because, even after

working for Excelsior for 24 years, she believed she was treated as a lesser employee

based on her gender.  Docket No. 86-3 at 4, ¶ 24-25.

### C.  Retaliation

Gianfrancisco alleges that, as a consequence of filing a complaint about the

play, she was subject to various forms of retaliation.  First, Gianfrancisco claims that

---

[6]Zlobec informed Gianfrancisco that reprimands were usually confidential at Excelsior and that, even if Brown was reprimanded, Gianfrancisco would not be privy to this information.

Excelsior restricted her ability to lead group therapy sessions.  Second, Gianfrancisco claims that Excelsior denied her request to continue working with the Canine Healers group.  And third, Gianfrancisco contends that she was not compensated for producing graduation videos for the students.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Board of Regents of the University of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

### III.  ANALYSIS

#### A.  Lilly Ledbetter Fair Pay Act

Title VII prohibits employers from discriminating against an individual with respect to compensation because of membership in a protected class.  42 U.S.C. § 2000e-2(a)(1).  In 2009, the Lilly Ledbetter Fair Pay Act ("Ledbetter Act"), Pub. L. No. 111-2, added the following language to Title VII's provision governing time limits for filing an administrative charge:

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e-5(3)(A).

Congress enacted the Ledbetter Act in response to the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007), which held that a plaintiff's wage discrimination claim was untimely because the administrative charge was filed more than 300 days following the pay-setting decision.  *Id*. at 622.  The Ledbetter Act was enacted to extend the accrual period for asserting claims with regard to discriminatory compensation decisions.  It ensures that the period during which a plaintiff may file a charge of discrimination renews each time an employer makes a discriminatory wage decision under Title VII.  The Ledbetter Act addresses the problem identified by the dissent in *Ledbetter*, that the 300-day accrual limitation strips a plaintiff

of a remedy because a plaintiff is usually unaware that discrimination motivated a compensation decision until it is too late.  *See Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1182-83 (10th Cir. 2011) (the dissent in *Ledbetter* argued that the better rule is "to trigger the accrual of a compensation discrimination claim not only when employers intentionally discriminate in pay-setting decisions, but also when they discriminate in other ways that cause a discriminatory pay disparity.").

The Ledbetter Act deems each paycheck issued pursuant to a discriminatory pay structure an independent, actionable employment practice.  It also explicitly provides for "recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to . . . [those] that occurred outside the time for filing a charge."  42 U.S.C. § 2000e-5(3)(B).  Because the statute modifies accrual dates for claims of discrimination, if Gianfrancisco can demonstrate that her wages were the result of a discriminatory decision to pay her less than her male coworkers, she can recover for each paycheck received dating back to 300 days prior to the filing with the EEOC, and does not need to show that the discriminatory decision occurred within this period. Gianfrancisco may also recover back pay for up to two years prior to February 14, 2008 (300 days before December 10, 2008, the day she filed a charge of discrimination).

### 1.  Scope of the EEOC Charge

Excelsior contends that, because plaintiff limited the scope of her charge of discrimination to the specific time period of May 17, 2008 to September 3, 2008, any claims arising outside of this period are time-barred.  Docket No. 72 at 10-12. Moreover, because an administrative agency would not reasonably conduct an

investigation outside of May 17, 2008 to September 3, 2008, Excelsior claims that Gianfrancisco has failed to exhaust her administrative remedy for all claims outside of this period. *Id*.

A Title VII plaintiff must exhaust his or her administrative remedies for each individual discriminatory or retaliatory act. *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003). "In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) (citation omitted). In determining whether a plaintiff has exhausted his or her administrative remedies, the court must identify the scope of the allegations raised in the EEOC charge because a "plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Mackenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).

The Court finds that plaintiff's wage discrimination claim may reach conduct that occurred prior to May 17, 2008. Under the Ledbetter Act, Gianfrancisco need only show that she received wages lower than similarly situated male co-workers between May 17, 2008 and September 3, 2008 in order to be eligible to receive back pay for up to two years. If Gianfrancisco can show that she received lower wages for similar work, then the Court must determine whether her lower wages were the result of a discriminatory decision, regardless of when that decision occurred. *See* 42 U.S.C. § 2000e-5(3)(B) (a plaintiff need only show that a wage event occurred during the period listed in her charge of discrimination, and that this discriminatory event is related

to a decision that "occurred outside the time for filing a charge."). Thus, whether plaintiff failed to exhaust her administrative remedies for claims outside of this period is irrelevant as it would not alter her entitlement to damages under the Ledbetter Act.

### 2. Title VII Wage Discrimination

Under Title VII, a pay discrimination claim requires "proof of unequal pay between the employee and co-workers outside the protected class doing the same work." *Almond*, 665 F.3d at 1181. Moreover, such claims are limited to factual situations involving "unequal pay for equal work," and the "key to a successful claim is a showing that the employer discriminatorily paid the employee too little for the position he or she occupies." *Id*. at 1180-81. Accordingly, Gianfrancisco must prove that Excelsior intentionally discriminated against her because of her gender. *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1306 (10th Cir. 2005).

Because Gianfrancisco does not have direct evidence of wage discrimination, the Court employs the three-step burden-shifting framework set forth in *McDonnell Douglas* and its progeny. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-07 (1973). Under *McDonnell Douglas*, Gianfrancisco must first establish a prima facie case of discrimination. *Id*. at 802. Relevant to this case, a prima facie showing of discrimination consists of evidence that she "occupie[d] a job similar to that of higher paid males." *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1117 (10th Cir. 2005), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). If Gianfrancisco makes such a showing, the burden of production shifts to the Excelsior "to state a legitimate, nondiscriminatory reason for its adverse employment

action." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). "If [Excelsior] meets this burden, then summary judgment is warranted unless [Gianfrancisco] can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id*. That is, Gianfrancisco must show that Excelsior, regardless of the proffered reasons, likely relied on discriminatory animus to pay her a lower salary. *Sprague v. Thorn Am. Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997).

Excelsior claims that Gianfrancisco cannot establish a prima facie case of wage discrimination because an ACC position is not similar to a TTC position. In support, Excelsior provides Gabrielson's deposition testimony which states that an ACC is a lower position in Excelsior's employee hierarchy when compared to a TTC. Docket No. 72-2 at 7-8 (Gabrielson Dep. 23:24-24:10). In addition, Excelsior argues that Hurd's deposition testimony shows that, although Hurd believed that a switch from an ACC to a TTC was a lateral move, she also stated that an ACC does not have to supervise a team and therefore has fewer responsibilities than a TTC. Docket No. 77-8 at 3 (Hurd Dep. 25:1-8). Moreover, Excelsior argues that Gianfrancisco understood a lateral move to mean only no "change in salary," not that the duties between an ACC and a TTC would be similar. Docket No. 85-3 at 1.

In response, plaintiff provides Roth's affidavit, which indicates that the two positions have comparable duties, Docket No. 77-3 at 2, ¶ 8, and Sicard's deposition, which also states that an ACC would have the same level of responsibility as a TTC. Docket No. 77-9 at 4 (Sicard Dep. 12:11-20). Viewing the evidence in a light most favorable to plaintiff, the Court finds that Gianfrancisco has met her burden of establishing a prima facie case of pay discrimination based on gender. As a female,

13

Gianfrancisco is a member of a protected class and, based on the salary figures provided by Excelsior, she received a lower yearly salary when compared to Zaffaroni, a male employee, after July 12, 2004 and for the years 2005, 2007, and 2008.[7]  *See* Docket No. 72-1 at 3-6.  Additionally, plaintiff's wages at Excelsior were directly related to the 2004 employment decision that changed her position from a TTC to an ACC.  42 U.S.C. § 2000e-5(3)(B).

Because plaintiff has established that she earned lower wages when compared to a similarly-situated male employee, the burden shifts to Excelsior to articulate a legitimate, non-discriminatory reason for providing Zaffaroni with a higher salary.  In providing a legitimate non-discriminatory reason, Excelsior "need not persuade the court that it was actually motivated by the proffered reasons."  *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Excelsior presents two reasons for Zaffaroni's higher salary.  First, Excelsior argues that Zaffaroni received greater compensation because of his greater seniority, and second, because Zaffaroni had more responsibility since he was given the job of implementing changes to the Renaissance cottage.  Docket No. 77-2 at 2 (Zaffaroni Dep. 16:12-20).  Because Excelsior has presented two legitimate nondiscriminatory reasons for Zaffaroni's larger salary, the burden shifts back to Gianfrancisco to show that Excelsior's articulated reasons are mere pretexts for discrimination.  A plaintiff can show pretext by "revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its

---

[7]Gianfrancisco received a higher yearly salary than Zaffaroni in 2006.

14

action that a reasonable factfinder could rationally find them unworthy of credence." *Mickelson V. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006) (citation omitted).

Plaintiff argues that seniority was not a controlling factor with regard to employee compensation at Excelsior. She relies on Roth's affidavit which states that, before 2007, the Human Resources department at Excelsior did not have a rule or understanding that seniority was the key factor in setting wages. Docket No. 77-3 at 1, ¶¶ 3-4. Plaintiff also presents her own affidavit to argue that she was never aware that seniority was the "key feature" in establishing salaries. Docket No. 77-1 at 1, ¶ 3. Finally, plaintiff claims that Excelsior's reliance on seniority is contradicted by the fact that she received a higher salary than Zaffaroni in 2006.

Although Excelsior provided evidence that it considered seniority when setting employee compensation, *see, e.g.,* Docket No. 72-2 at 6 (Gabrielson Dep. 14:7-11) (a person with more seniority could lack a professional license yet earn a higher salary); Docket No. 77-8 at 4 (Hurd Dep. 32:16-20) (Hurd assumed that greater seniority meant higher wages); Docket No. 77-13 at 4 (Zlobec Dep. 32:6-15) (an individual who begins his employment at a higher rate will continue to earn a salary at that higher rate even if they change positions); Docket No. 85-3 (2004 email from Gianfrancisco noting that Gabrielson advised the staff that "counselors salaries [would change] to signal a value to their seniority"), this evidence does not conclusively establish that seniority was the "key" or deciding factor in determining salaries. Viewing the evidence in a light most favorable to plaintiff, the Court finds that plaintiff raises a genuine dispute of fact about whether she was subject to discrimination based on her gender. A jury could

15

reasonably believe that Excelsior's non-discriminatory reason is pretextual and that Excelsior discriminated against plaintiff because of her gender when it provided Gianfrancisco with a lower salary than Zaffaroni. Accordingly, the Court denies Excelsior's motion for summary judgment on plaintiff's Title VII gender discrimination claim.

### B.   Hostile Work Environment

To survive summary judgment on a hostile work environment claim, a plaintiff must show that "under the totality of circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Chavez v. New Mexico*, 397 F.3d 826, 831-32 (10th Cir. 2005) (citation omitted). Factors considered in determining whether a working environment is sufficiently hostile or abusive include: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Mackenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005). A showing of pervasiveness requires more "than a few isolated incidents of racial enmity." *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). "Instead, there must be a steady barrage of opprobrious racial comments." *Chavez*, 397 F.3d at 832.

First, Gianfrancisco admitted that her work conditions were not altered by the play and that she was able to competently perform all of her work activities. Docket No. 72-5 at 35 (Gianfrancisco Dep. 163:7-8). Because Gianfrancisco fails to show that the

play created an objectively abusive or hostile environment, she raises no facts sufficient to create a genuine issue of fact that Excelsior was "permeated with discriminatory intimidation, ridicule, and insult, [ ] sufficiently severe or pervasive to alter the conditions" of her employment.  *MacKenzie*, 414 F.3d at 1280.

Second, the Court finds that the evidence, even viewed in a light most favorable to Gianfrancisco, is insufficient to show the play was racial or stemmed from racial animus towards Italian Americans.  Gianfrancisco offers no evidence that the play "stemmed from racial animus."  *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).  Brown's letter of apology states that the play was an attempt to teach the students at Excelsior a lesson about gangs through mob culture.  *See* Docket No. 72-14.  As Brown noted in his letter of apology, the character of Vito Tortellini does not speak in a manner suggestive of an Italian accent, but rather use slang as would a thug from the 1920s or 1930s.  *See* Docket No. 72-14.  Additionally, Italian Americans were not the sole focus of the play; rather, the play ridiculed various individuals employed by Excelsior.  The evidence in the record shows that the play and the character of Vito Tortellini were not created out of hostility towards Italian Americans.

Even fully crediting plaintiff's belief that the play was discriminatory because it portrayed Italian Americans as criminals and used stereotypical slang, these facts, while offensive, fall short of the necessary statutory showing of a hostile work environment.  *See Bolden*, 43 F.3d at 551 (evidence of two overtly racial comments and one arguably racial remark over the course of plaintiff's eight years of employment does not constitute pervasive conduct); *Chavez*, 397 F.3d at 833 (finding that two racially

motivated comments fall far short of the "steady barrage" required for a hostile environment claim); *Trujillo v. Univ. of Colo. Health Sciences Center*, 157 F.3d 1211, 1214 (10th Cir. 1998) (holding that federal law "does not guarantee a utopian workplace, or even a pleasant one") (citation omitted); *Pickens v. Shell Tech. Ventures, Inc.*, 118 F. App'x 842, 850 (5th Cir. 2004) (holding that a company Christmas party where a skit with characters in blackface was performed and racially insensitive comments were made to plaintiff did not create a hostile work environment); *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 738 (8th Cir. 2000) (finding that a skit and four inappropriate comments can not state a claim of a hostile work environment based on sex discrimination). No rational factfinder could conclude that, based on the performance of the play, animus towards Italian Americans was so pervasive at Excelsior that it created a hostile environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (Title VII is not a "general civility code" and "sporadic use of abusive language, gender-related jokes, and occasional teasing" are among the "ordinary tribulations of the workplace"); *Witt*, 136 F.3d at 1433 (courts must consider the nature and context of the incidents, keeping in mind that the "mere utterance of a statement 'which engenders offensive feelings in an employee' would not affect the conditions of employment to a sufficiently significant degree to violate Title VII.").

Gianfrancisco argues that, even if the play is not evidence of pervasive hostility, it constitutes a single severe event which transformed Excelsior into a hostile environment. Docket No. 77 at 11-12. Plaintiff relies on *Tademy v. Union Pac. Corp.*, 614 F.3d 1132 (10th Cir. 2008), a case where the Tenth Circuit held that a "sufficiently

18

severe episode may occur as rarely as once" and still create a hostile work environment. *Id*. at 1144.  In *Tademy*, the Tenth Circuit found that, even though the plaintiff was not subjected to racism on a daily basis, evidence of "highly offensive graffiti" and a "life-sized lynching noose" hanging in a work shack were sufficiently "egregious act[s] of discrimination calculated to intimidate African-Americans." *Id*. at 1144-45.

Although the play portrayed Vito Tortellini as an unintelligent, violent mobster, it fell short of racial denigration of Italian Americans and did not include events calculated to intimidate or threaten physical action. *See id*. at 1142 (observing that "the [lynching] noose is among the most repugnant of all racist symbols.").  As such, the play was not a severe enough event that is, on its own, susceptible to an inference of a hostile work environment.[8]  *Cf. Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) ("Breaking the arm of a fellow employee because she is a woman, or, as here, damaging her wrist to the point that surgery was required, because she was a woman, easily qualifies as a severe enough isolated occurrence to alter the conditions of her employment"); *see MacKenzie*, 414 F.3d at 1280 (noting "courts should filter out offhand comments, and isolated incidents"); *Chavez*, 397 F.3d at 832 ("Title VII is not a code of workplace

---

[8]Due to plaintiff's failure to establish a hostile environment claim, the Court does not have to determine whether there is evidence that Excelsior's "response to the incident[] of which it was apprised was inadequate." *Tademy*, 614 F.3d at 1139.  The Court notes, however, that Excelsior responded to Gianfrancisco's complaint by holding two meetings wherein Brown and Clevenger apologized for their participation in the play and canceled the play permanently. *See Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1310 ("If the employer's response ends the harassment by the employee in question, we presume that the remedial action was sufficient.").

conduct . . . a hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment based on [national origin].").  Accordingly, Excelsior is entitled to summary judgment on plaintiff's hostile work environment claim.

### C.   Constructive Discharge

Having failed to produce evidence raising a genuine issue of fact that the play created a hostile work environment, plaintiff cannot sustain the more onerous burden of proving a national origin discrimination claim premised on constructive discharge.  To prove such a claim, plaintiff must show both the existence of a hostile work environment and that her "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign."  *See Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004); *see also Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1270 (10th Cir. 2004) (noting that the constructive discharge test is objective, "under which neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant.") (citation omitted).  Because plaintiff has failed to sustain a hostile work environment claim in the first instance, a reasonable jury could not find, on the basis of the record before the Court, that Excelsior deliberately made or allowed plaintiff's working conditions to becomes so intolerable that she had no other choice but to quit.  *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992).

### D.   Retaliation

Gianfrancisco alleges that Excelsior retaliated against her for filing a complaint about the play.  Plaintiff claims that she was subject to retaliation when she was (1) removed from group therapy sessions, (2) denied participation in the Canine Handlers program, and (3) denied compensation for work on the students' graduation video. Docket No. 77 at 11.

Title VII prohibits retaliation against individuals who oppose discriminatory employment practices in complaints or investigations of employment practices prohibited by Title VII.  *See* 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must prove three elements: "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action."  *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1264-65 (10th Cir. 2007).  If plaintiff can establish a prima facie case, defendant must then articulate a legitimate, nondiscriminatory or non-retaliatory reason to support its employment decision.  *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).

"Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [anti-discrimination statutes]."  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  Additionally, a causal connection "may be demonstrated by evidence of circumstances that justify an

inference of retaliatory motive, such as protected conduct closely followed by adverse action." *See Conner v. Schnuck Markets*, *Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).

Excelsior claims that Gianfrancisco fails to raise a viable retaliation claim because it was unreasonable for her to believe that she engaged in protected activity. Docket No. 72 at 17. The Court disagrees. Plaintiff's formal complaint about the play and its portrayal of Italian Americans constitutes protected activity.[9] *See* 42 U.S.C. § 2000e-3(a); *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) (plaintiff need not show the employer discriminated against her; plaintiff need only show that, after she engaged in protected activity, she had a reasonable good-faith belief the opposed behavior was discriminatory). The question thus becomes whether Gianfrancisco was subject to an "adverse employment action." *Jencks*, 479 F.3d at 1264-65.

The Tenth Circuit has "liberally define[d] the phrase 'adverse employment action'" and takes "a case-by-case approach, examining the unique factors relevant to the situation at hand." *Hillig v. Rumsfeld,* 381 F.3d 1028, 1031 (10th Cir. 2004) (citations omitted). In general, only acts that "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" will rise to the level of an adverse employment action. *Id*. at 1038. However,

---

[9]Plaintiff's claim that she was retaliated against because she did not receive payment for the graduation video, however, does not state a viable retaliation claim. Plaintiff has not shown that she requested compensation for the graduation video before her resignation. She only alleges that, after she resigned from Excelsior, she discovered that another individual received compensation for producing the video.

22

the term "adverse employment action" is not necessarily limited to such acts.  *Id*. at

1031 (noting that an employer's action that causes "harm to future employment

prospects," such as a negative job reference, can be considered an adverse

employment action (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986–87 (10th

Cir.1996))).  Although the term is not confined, for example, to "monetary losses in the

form of wages or benefits[,] . . . 'a mere inconvenience or an alteration of job

responsibilities'" does not constitute an "adverse employment action."  *Sanchez v.

Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998).  Accordingly, a plaintiff must

show that the alleged adverse action caused more than "*de minimis* harm" to or a "*de

minimis* impact" upon an employee's job opportunities or status.  *Hillig*, 381 F.3d at

1033 (emphasis in original).

        The Court finds that plaintiff has failed to provide any evidence – direct or

otherwise – that she was subject to any adverse employment action in retaliation for

complaints about the play.  It is undisputed that Gianfrancisco's removal from group

therapy sessions and from Canine Healers did not lead to a negative job reference, did

not reduce her compensation,[10] and did not cause a change in her overall benefits.

Docket No. 72-5 at 33-35 (Gianfrancisco Dep. 150:11-14, 163:7-19).  The record shows

that these actions were undertaken because she had not fully recovered from a back

injury.  Docket No. 72-17 at 1; Docket No. 72-19.  Accordingly, Gianfrancisco fails to

raise a genuine issue of fact that Excelsior subjected her to an adverse employment

---

        [10]Plaintiff claims that she was denied "payment for continued work with my dog
therapy program," Docket No. 77-1 at 4, but does not deny that, due to her back injury
and the possibility of reinjuring herself if involved with clients, she was not allowed to
participate in the Canine Healers program until her doctor approved.

action in retaliation for engaging in protected activity.  *Sanchez*, 164 F.3d at 532.

Therefore, Excelsior is entitled to summary judgment on plaintiff's retaliation claim.

## IV.  CONCLUSION

Based on the foregoing, it is

**ORDERED** that Defendant's Motion for Summary Judgment and Brief in Support

Thereof [Docket No. 72] is **GRANTED** in part and **DENIED** in part as indicated in this

Order.

DATED July 13, 2012.

BY THE COURT:

 s/Philip A. Brimmer                                   
PHILIP A. BRIMMER
United States District Judge